J-S17006-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: L.A.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.M.W., MOTHER | : | No. 213 MDA 2021 |

Appeal from the Decree Entered February 4, 2021
In the Court of Common Pleas of Luzerne County
Orphans' Court at No:  A-9026

BEFORE:   STABILE, J., KUNSELMAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY STABILE, J.:                 **FILED: August 13, 2021**

D.M.W. ("Mother") appeals from the decree entered on February 4, 2021, granting the petition of S.M. ("Father") and T.M. ("Stepmother") (collectively, "Petitioners") and terminating involuntarily her parental rights to her son, L.A.M. ("Child"), born in July 2009.  After careful review, we affirm.

The record reveals that Child was born of Mother's brief relationship with Father, which began in early 2008 and ended when Child was six months old or younger.  N.T., 1/13/21, at 8; N.T., 1/28/21, at 16.  After the parties' separation, Father began a child custody action and obtained primary physical custody of Child.  N.T., 1/13/21, at 9, 12-13, 26-27.  This lasted until in 2010, when Father incurred a Driving Under the Influence charge and subsequent conviction.  **Id.** at 27-31.  Father was incarcerated, and the local Children and

_____

[*] Retired Senior Judge assigned to the Superior Court.

Youth agency became involved.[1]  *Id.*  The agency ended its involvement after placing Child in the custody of his paternal grandmother.  *Id.* at 9.  In 2013, after Father's release, he and the paternal grandmother entered a stipulation transferring custody of Child back to Father.  *Id.* at 14, 31-32, 50.  Father and the paternal grandmother did not involve Mother in their custody matter, and it appears Mother was largely absent from Child's life by that time.  *Id.* at 32-33, 51.

The record indicates that Mother last had contact with Child in April of 2014, according to Father, or sometime in 2013, according to Mother.  *Id.* at 15; N.T., 1/28/21, at 19, 23-25, 37, 65-66.  Father contacted Mother via text message and asked if she would like to visit Child, and the parties agree the visit did not go well.  N.T., 1/13/21, at 15-16, 34-35; N.T., 1/28/21, at 18-19, 21, 39.  Mother maintains the visit went poorly because Child referred to Father's girlfriend at the time, who was not Stepmother, as his "mom."  N.T., 1/28/21, at 18, 21.  Father maintains the visit went poorly because Child had not seen Mother in a long time and did not know who she was, and because Child "complained that she smelled."  N.T., 1/13/21, at 16, 35.  Regardless, Child never saw Mother again, did not speak with her on the phone, and did not have any other form of contact with her.  *Id.* at 15-16, 20-23, 34-36, 52; N.T., 1/28/21, at 8-9, 12-13, 21-26, 29-50.

---

[1] Father testified he and Mother had a history with Children and Youth dating back to at least the time of their separation.  N.T., 1/13/21, at 9, 12-13, 24. He blamed Mother for this, asserting the agency became involved because of "inappropriate stuff that she had done."  *Id.* at 25.

Father began a relationship with Stepmother at a time unspecified in the record. Petitioners went on to marry in 2014. N.T., 1/13/21, at 22, 33; N.T., 1/28/21, at 11-13. Father resides with Stepmother, as well as Child, Child's half-sister from a different relationship, and Child's two stepsisters. *Id.* at 22. Stepmother is actively involved in raising Child, who maintains a parental bond with her and refers to her as his mother. N.T., 1/13/21, at 40; N.T., 1/28/21, at 52-56, 61, 71-78.

On May 11, 2020, Petitioners filed a petition to terminate involuntarily Mother's parental rights to Child. The orphans' court conducted a hearing on January 13, 2021, and January 28, 2021.[2] At the conclusion of the hearing, the court announced that it would terminate Mother's rights, and it entered a decree memorializing this decision on February 4, 2021. Mother timely filed a notice of appeal and concise statement of errors complained of on appeal on February 11, 2021.

Mother raises the following claim for our review:

A. Whether the [orphans'] court erred in terminating parental rights and/or abused its discretion in giving primary consideration pursuant to the factors set forth in 23 Pa. C.S.A. [§] 2511(b)[](developmental, physical, and emotional needs and welfare of the child) because testimony presented at trial established a strong parent-child bond that would be detrimental

---

[2] The trial court appointed a single attorney, Marsha Ann Basco, Esquire, to represent Child's legal and best interests during the proceedings. Attorney Basco indicated at the hearing that she could represent both sets of interests without conflict. N.T., 1/13/21, at 3.

to the physical, emotional, and general well-being of the minor child if the bond were to be severed?

Mother's Brief at 3 (unnecessary capitalization omitted).

We review Mother's claims pursuant to the following standard of review:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Section 2511 of the Adoption Act governs the involuntary termination of parental rights. *See* 23 Pa.C.S.A. § 2511. It requires a bifurcated analysis:

. . . . Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

- 4 -

In this case, the orphans' court terminated Mother's rights pursuant to Sections 2511(a)(1) and (b), which provide as follows:

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

\*\*\*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

Mother purports to focus her appeal solely on Section 2511(b). Mother did not include a claim regarding Section 2511(a)(1) in her concise statement or statement of questions involved, nor does she develop a claim regarding Section 2511(a)(1) in the argument section of her brief. Accordingly, Mother has waived any challenge regarding Section 2511(a)(1) in this appeal. *In re M.Z.T.M.W.*, 163 A.3d 462, 465-66 (Pa. Super. 2017).

Despite Mother's apparent intention to limit her argument on appeal to Section 2511(b), the actual substance of her argument is better suited to a challenge pursuant to Section 2511(a)(1). Mother argues she established a bond with Child early in his life, which deteriorated because Father did not do enough to ensure she and Child remained in contact. Mother's Brief at 14-16. This assertion, that Father created obstacles preventing her from maintaining a relationship with Child, is a classic Section 2511(a)(1) claim. Therefore, we address Section 2511(a)(1) in the alternative and confirm that, even if Mother had not waived any challenge regarding that subsection, it would be meritless.

To satisfy the requirements of Section 2511(a)(1), "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." *In re Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008). The trial court must then consider the parent's explanation for his or her abandonment of the child, in addition to any post-abandonment contact. *Id.* This Court has emphasized that a parent does not perform parental duties by displaying a merely passive interest in the development of a child. *In re B.,N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004), *appeal denied*, 872 A.2d 1200 (Pa. 2005) (quoting *In re C.M.S.*, 832 A.2d 457, 462 (Pa. Super. 2003), *appeal denied*, 859 A.2d 767 (Pa. 2004)). Rather,

> [p]arental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in

order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

***Id.*** (citations omitted).

The orphans' court discussed its decision to terminate Mother's rights to Child pursuant to Section 2511(a)(1) as follows, in relevant part:

> . . . . Mother contends that Father's family members would not respond to her through Facebook. Mother, however, did not produce any evidence to support her assertion that the family members did not respond to her. Furthermore, the [c]ourt does not find Mother's testimony to be compelling. Mother had plenty of opportunities to seek visits with the child. First, the child resided at his great grandmother's address in 2017. Mother was previously at that address with Father and the child. Mother also admitted that she came to that address with a Children and Youth caseworker to see the child. Mother stated that she did not remember where the grandmother's home was located because she was unfamiliar with the area. However, when she was asked whether she asked the caseworker for the address, her response was that she did not and that it was Father's responsibility to give her the address not the caseworker. Had Mother obtained the grandmother's address and telephone number through the caseworker, Mother could have called the grandmother and asked for Father's address or telephone number. Mother could have also driven to the [g]randmother's residence in order to obtain information on Father so that she can see the child. Mother did not do any of those things. The [c]ourt questions whether it was more important for Mother to visit with the child or whether it was more important for Mother to be more "right" than Father.
>
> Also, Father reached out to Mother in April 2013 or 2014 in order to see the child by texting her, yet somehow Mother claims that her phone broke and she no longer had Father's phone number. Mother was presented with another opportunity at a

support conference thereafter held in Luzerne County. Mother sat across from Father and his attorney, yet it did not occur to her to ask the domestic relations officer or even Father's counsel for Father's address. Even if Father's address would not have been given, Mother would have been able to file for custody and serve Father's counsel with the pleadings.

As the [c]ourt stated at the end of trial, we live in a digital age. The opportunity to obtain personal information, specifically addresses, is inescapably simple. Therefore, the [c]ourt did not find Mother's testimony to be compelling.

Orphans' Court Opinion, 3/11/21, at 13-15.

As detailed above, Petitioners filed their petition to terminate Mother's parental rights to Child involuntarily on May 11, 2020. This means the critical six-month period under Section 2511(a)(1) began on November 11, 2019. It is undisputed Mother had no contact with Child during the critical six months. Indeed, Mother had no contact with Child since 2014 according to Father and 2013 according to Mother. N.T., 1/13/21, at 15; N.T., 1/28/21, at 19, 23-25, 37, 65-66. Mother did not have contact with Child in person, call Child on the phone, send Child anything in the mail, or interact with Child in any other way. *Id.* at 15-16, 20-23, 34-36, 52; N.T., 1/28/21, at 8-9, 12-13, 21-26, 29-50. Thus, Mother did not just fail to perform parental duties during the *six months* preceding the filing of the petition; she failed to perform parental duties during the *six to seven years* preceding the filing of the petition.

It was well within the discretion of the orphans' court to conclude Mother failed to present a sufficient justification for her lack of involvement in Child's life. Contrary to Mother's argument, it was her duty, not Father's, to ensure

that she maintained a relationship with Child. **_B.,N.M._**, 856 A.2d at 855. To the extent that obstacles made maintaining a relationship with Child difficult, it was Mother's obligation to make reasonable, good faith efforts to overcome those obstacles. **_Id._** As the court observed, Mother had many opportunities over the years to reach out to Father for contact with Child or obtain Father's contact information. Mother even admitted Father facilitated her final visit with Child by sending her a text message, meaning she had access to Father's phone number, although she asserted that she later lost the number because her phone broke.[3] N.T., 1/28/21, at 19, 24-25. 30-31, 39. Despite these opportunities, Mother testified she made only minimal efforts to contact Child, which consisted primarily of sending messages to members of Father's family on Facebook, which they did not appear to read. N.T., 1/28/21, at 21-26, 29-44, 47-50. When asked what she did to contact Father and Child during the three years from 2017 to 2020, Mother replied that she sent messages in 2018 and 2019 but did nothing else. **_Id._** at 42-43 ("I wrote to -- I think in 2018 I reached out to -- I believe it -- maybe it was his aunt. One of the two I reached out to in 2018, and then I reached out to somebody again in 2019."). Accordingly, even if Mother had not waived any claim regarding Section 2511(a)(1), we would conclude that the record supports the court's findings, and that any such claim would be meritless.

---

[3] Father testified he had the same phone number since 2011. N.T., 1/13/21, at 16, 19.

We next consider Mother's lone preserved claim on appeal, challenging termination of her parental rights pursuant to Section 2511(b).[4] The requisite analysis is as follows:

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the [S]ection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)) (citations and quotation

marks omitted).

The orphans' court analyzed Section 2511(b) in its opinion as follows, in

relevant part:

---

[4] Contrary to the arguments in Petitioners' brief, we find that Mother presented this claim in her concise statement with sufficient clarity to avoid waiver, and that she preserved it in her brief by developing it with citations to the record and the pertinent statute.

The [c]ourt finds that the child's physical needs, developmental needs and emotional needs are met by the petitioners, Father and his wife, [Stepmother]. Father testified that he lives with his wife, his two minor children, and his two stepdaughters. Father testified that he does not receive any child support from [] Mother . . . . In fact, Mother filed to terminate her child support for [Child.] Father testified that he and his wife support [Child] and provide for [Child's] physical needs. Father testified that he and his wife provide food and clothing for all minor children including [Child.] Father stated that he prepares the meals for the family. He further stated that his wife takes [Child] to his doctor's appointments. Father testified that his wife helps the children get ready for school in the morning and he helps put[] the children to bed.

Father and his wife also provide for [Child's] developmental needs. Father testified that he and his wife attend the parent teacher conferences for the minor child and also help [Child] with his homework.

Father and his wife also provide for [Child's] emotional needs. Father testified that the minor child, [Child], looks to him and his wife as his parents. The minor child and his siblings refer to [Stepmother] as "Mommy[."] Father stated that his son and his half-sister[] have developed a bond with his wife and began calling his wife, "Mommy[."] Father stated that he believes that his wife reciprocates the bond very strongly to the children.

Father testified that in the event the [c]ourt grants the petition to terminate Mother's parental rights, it is his intention and his wife's intention to have the child, [Child,] adopted by [Stepmother] so that his wife can become his legal [m]other. Father does not believe that Mother and [Child] have any type of bond. Father further stated that the termination of Mother's parental rights would not have any negative effect upon [Child.]

[Stepmother] testified that she does many activities with [Child] such as crafts, decorating for the holidays, playing games, cooking and swimming. [Stepmother] testified that she refers to [Child] as her son and [Child] calls her "Mom[."] [Stepmother] further stated that when [Child] plays and falls and hurts himself, he runs to her for comfort. [Stepmother] also testified that she and [Child] have a close bond. She added that she loves the child more than anything in the world. [Stepmother] testified that in

- 11 -

the event the court grants an adoption in the future, she realizes that she would be legally obligated to the minor child. [Stepmother] testified that she loves Father's children "with everything that she has" and that they are "her life and her world[."]  They are the "reason that she lives and breathes every day."

Orphans' Court Opinion, 3/11/21, at 15-17 (citations to the record omitted).

We discern no abuse of discretion in this analysis.  Child has not had any contact with Mother since 2013 or 2014, when he was approximately four or five years old.  N.T., 1/13/21, at 15; N.T., 1/28/21, at 19, 23-25, 37, 65-66.  At the time the termination hearing concluded on January 28, 2021, Child was eleven-and-a-half years old and had not seen Mother in nearly seven or eight years.  It is apparent from these circumstances that Child does not share a meaningful bond with Mother.  *See Matter of Adoption of M.A.B.*, 166 A.3d 434, 449 (Pa. Super. 2017) (explaining, "a child develops a meaningful bond with a caretaker when the caretaker provides stability, safety, and security regularly and consistently to the child over an extended period of time.").  Child instead shares a bond with Stepmother, who has been married to Father since 2014, and who has acted as a second parental figure in Child's life in Mother's absence.  N.T., 1/13/21, at 40; N.T., 1/28/21, at 52-56, 61, 71-78.  Because the record again supports the findings of the orphans' court, we affirm the termination of Mother's rights pursuant to Section 2511(b).

Based on the foregoing analysis, we conclude the orphans' court did not commit an abuse of its discretion by terminating Mother's parental rights to Child involuntarily, and we affirm the court's February 4, 2021 decree.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/13/2021